## STATE OF CONNECTICUT *v.* BRENT PASCAL
### (AC 27463)

Flynn, C. J., and McLachlan and Pellegrino, Js.

Argued March 28—officially released July 8, 2008

*Mary H. Trainer*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, was *Kevin D. Lawlor*, state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Brent Pascal, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the prosecutor engaged in impropriety that deprived him of a fair trial and (3) the court improperly instructed the jury on consciousness of guilt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 17, 2004, at approximately 10:30 a.m., a man later identified as the defendant entered Romantix, an adult retail establishment, located on Boston Post Road in Milford. On that day, Christopher Towne was the clerk on duty at Romantix and was working the 9 a.m. to 5 p.m. shift. During the next several hours, the defendant, who was wearing a powder blue sleeveless T-shirt, a powder blue do-rag on his head and powder blue boots, remained in Romantix, though he frequently walked in and out of the store. At one point, the defendant purchased a video card, which he used to view adult movies in a video booth located in the store.

Shortly before 4 p.m., the defendant approached Towne, who was standing near a chair behind the counter, and motioned toward his waistline. The defendant then lifted his shirt, revealing a portion of a handgun. As the defendant reached toward the handgun, he stated to Towne: "You know what this is. You know what you have to do. Open the register and put the money in the bag." The defendant also stated: "This is how I make my money." Towne then walked over to

the first cash register and, after several attempts, opened the register. Towne put the money from the cash register, which totaled $270, into a bag and handed the bag to the defendant. The defendant, after looking at the money in the bag, became angry and told Towne to open the other cash register because the bag did not contain enough money. Towne informed the defendant that he was unable to open the other register because he did not have a key. The defendant remained in the store for approximately five to ten minutes before departing.

After the defendant exited Romantix, Towne activated an alarm, which notified the police, and telephoned his supervisor. Detective Greg Kopanza of the Milford police department, as well as several other Milford police officers, responded to the call. Kopanza arrived at Romantix shortly after 4 p.m. to investigate the incident, and he spoke with Towne, who provided a description of the defendant. The police were unable to locate the defendant that day.

As part of his investigation, Kopanza spoke with a clerk who was working in a video store located in the same shopping plaza as Romantix and gave the clerk a description of the defendant. The video store clerk informed Kopanza that a person matching the defendant's description had been in the video store that day, and the clerk gave Kopanza a surveillance videotape, which depicted the defendant. Kopanza also obtained a surveillance videotape from Romantix, which revealed the defendant standing at the counter and then moving something near his waistline with his right hand. The videotape further depicted Towne removing money from the first cash register, placing the money in a bag and then handing the bag to the defendant.

Approximately four months later, on December 27, 2004, the defendant entered Romantix, purchased a

video card from the sales clerk, Ivan Aponte, and went into a video booth to the view a movie. Aponte, recognizing the defendant from a photograph taken from the video store's surveillance camera on August 17, 2004, used his cellular telephone to contact the police. Thereafter, several officers from the Milford police department, including Jason Anderson and Kenneth Rahn, were dispatched to Romantix. The police located the defendant, along with another male, who was partially undressed, in a video booth. The police questioned the defendant about his involvement in the August 17, 2004 robbery of Romantix, which he denied. The defendant initially provided the police with an incorrect name and date of birth, but the police eventually learned the defendant's actual name and date of birth from the defendant's mother.

In February, 2005, following further investigation, the defendant was arrested and charged with robbery in the first degree.[1] After the defendant's arrest, Nancy Bodick, president of Milford Boat Works, contacted the police because the defendant, her former employee, had left a pair of powder blue boots at Milford Boat Works. Bodick also informed the police that she had observed the defendant wearing the powder blue boots as well as a powder blue do-rag and a powder blue shirt. The police retrieved the boots from Milford Boat Works.

On December 6, 2005, the jury found the defendant guilty of robbery in the first degree. The court subsequently sentenced the defendant to seven years imprisonment, execution suspended after three years, and five years of probation with special conditions. This appeal followed. Additional facts will be set forth where necessary.

---

[1] In the initial information, the defendant also was charged with larceny in the fifth degree in violation of General Statutes § 53a-125a. The state later filed a long form information, charging the defendant only with robbery in the first degree.

I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal on the ground that there was insufficient evidence to support his conviction of robbery in the first degree. Specifically, the defendant argues that the evidence did not establish that he had the requisite mental state. We do not agree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept

as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 808–809, 911 A.2d 1099 (2007).

In order to find the defendant guilty of robbery in the first degree, the jury had to find beyond a reasonable doubt that the evidence showed that, "in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, [the defendant] or another participant in the crime . . . (4) display[ed] or threaten[ed] the use of what he represent[ed] by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." General Statutes § 53a-134 (a).

General Statutes § 53a-133 defines robbery as follows: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver

up the property or to engage in other conduct which aids in the commission of the larceny." Larceny is defined in relevant part by General Statutes § 53a-119 as follows: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

The mental state required to commit robbery in the first degree is the intent to commit larceny, which requires the specific intent to deprive or to misappropriate.[2] *State* v. *Sam*, 98 Conn. App. 13, 35, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006). "It is well settled, however, that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Citation omitted; internal quotation marks omitted.) Id., 35–36.

On appeal, the defendant claims that there was insufficient evidence to support his conviction of robbery in the first degree because the state failed to prove beyond a reasonable doubt that he had the necessary intent to commit the charged crime. In making this claim, the defendant asserts that the evidence adduced

[2] "Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Internal quotation marks omitted.) *State* v. *Calonico*, 256 Conn. 135, 162, 770 A.2d 454 (2001).

at trial supported only his version of events. Although the defendant did not testify at trial, his version of events was presented to the jury through a videotape and an accompanying transcript, which were admitted as full exhibits, that depicted an interview of the defendant conducted by Detective William Haas and Officer Nick Ricci of the Milford police department shortly after the defendant's arrest. According to the defendant, Towne, the clerk at Romantix, approached him prior to August 17, 2004, and asked him to return to the store for the purpose of engaging in a homosexual act with an acquaintance of Towne for $250, and the defendant agreed to this arrangement. Also during his interview, the defendant told the police that after he performed the homosexual act with another male at Romantix on August 17, 2004, he then sought payment from Towne. Because Towne initially refused to give the defendant money, the defendant stated that he became upset and used threatening words but maintained that he did not have a gun. Thereafter, Towne gave the defendant money, and the defendant left the store a few minutes later. On the basis of his view of the evidence, the defendant then contends that the jury could not have concluded that he possessed the requisite intent because, in taking the money from Romantix as payment for a sexual act, he acted in good faith and under a claim of right.[3]

Contrary to the defendant's assertion that his view of what had occurred at Romantix on August 17, 2004, was unchallenged, the state did present an alternate version of events through, in part, the testimony of Towne. The defendant, in challenging the sufficiency of the evidence, is challenging the credibility of Towne

[3] Because we conclude that the jury was not bound to accept the defendant's version of events, we do not analyze his "claim of right" argument in this section of the opinion but do so in his prosecutorial impropriety claim, which we address in part III.

and is seeking to have this court revisit the testimony and evidence presented at trial and to weigh it differently than did the jury, which we simply cannot do. "If there is conflicting evidence . . . the fact finder is free to determine which version of the event in question it finds most credible." (Internal quotation marks omitted.) *State* v. *Griffin*, 78 Conn. App. 646, 651, 828 A.2d 651 (2003). In the present case, it was not unreasonable for the jury to have believed the testimony of Towne and to have rejected the defendant's account of what had transpired at Romantix on August 17, 2004. Therefore, the jury, in crediting Towne's testimony about the defendant's conduct, reasonably could have inferred that the defendant intended to deprive Romantix of the $270 that he took from the cash register and that he did so by the threatened use of force of what he represented to be a handgun.

The following facts, which were before the jury, illustrate this sufficiency. There was evidence before the jury that the defendant approached Towne, who was near the counter, and motioned toward his waistline. The defendant then lifted his shirt and revealed a portion of a handgun. Towne testified that as the defendant reached toward the handgun, the defendant demanded that Towne give him money from the cash register. Specifically, the defendant stated: "You know what this is. You know what you have to do. Open the register and put the money in the bag." The defendant also stated: "This is how I make my money." Towne's testimony further indicated that after he put the money from the first cash register in a bag and handed the bag to the defendant, the defendant became angry and demanded additional money from the second register.

The state also introduced into evidence, as a full exhibit, the video surveillance tape from Romantix, dated August 17, 2004, which shows the defendant

approaching Towne at the counter and moving some-
thing at his waistline. The videotape further depicts
Towne handing money to the defendant in a bag. In
addition, the state presented Detective John Brunetti of
the forensic services division of the New Haven police
department as a witness, who testified that he had ana-
lyzed the video surveillance tape from Romantix.
According to Brunetti, the videotape revealed, inter alia,
that the defendant was holding an object in his right
hand. Construing the evidence in the light most favor-
able to sustaining the verdict, we conclude that the jury
reasonably could have determined that the defendant,
by revealing a handgun and demanding money from
the cash register, intended to deprive Romanitx of its
money by the threatened use of force by what the defen-
dant represented to be a handgun. Accordingly, we con-
clude that the state presented sufficient evidence to
support the defendant's conviction of robbery in the
first degree.

## II

Next, the defendant claims that the prosecutor's ref-
erence to "prostitution" during closing argument was
improper in several respects and that he was deprived
of a fair trial as a result of this alleged impropriety.
We disagree.

In his final argument to the jury, the prosecutor
stated: "The first thing in the course of a larceny, wrong-
fully [taking] another's property with no legal justifica-
tion or excuse—well, whose property did he take? The
evidence shows, Christopher Towne testified, you have
a business record, which is in evidence from the parent
corporation of Romantix, that $270 was taken from
register number one; that was the company's money.
The store's money was taken from that register . . .
on August 17, 2004. Did the defendant have any legal
justification or excuse to take their money? No. What

evidence have you heard of, anything other than he came in and demanded the money, and it was taken from the clerk at gunpoint? What evidence is there that this . . . I know counsel [has] intimated, and . . . there's some evidence out there that this was supposedly something over—you heard lots of gory details about what this was supposedly for. What did I ask Detective Haas when he was on the [witness] stand yesterday? What was that money transaction for? What's the evidence show that Detective Haas said? *Prostitution.* . . . [*I*]s *that legal? Is that a legal excuse? No.* So, even if the . . . defendant's version is to be believed, does that make a difference? It does not. It's a wrongful taking of another's property. You heard it from Mr. Towne. You saw it on the video. You heard that cash register pop. He cleaned out the money. He put all the money, except for the change, in a bag and handed it to him; threatened the immediate use of physical force. For whatever his reasoning, what did Christopher Towne tell you [the defendant] did? 'Don't do anything stupid. Put the money in a bag. This is how I make my money.' He displayed a handgun." (Emphasis added.)

The defendant concedes that he did not object to the alleged instance of prosecutorial impropriety at trial. "Once prosecutorial impropriety has been alleged, however, it is unnecessary for a defendant to seek to prevail under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding.* . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Citation omitted; internal quotation marks

omitted.) *State* v. *Fauci*, 282 Conn. 23, 33, 917 A.2d 978 (2007).

We now set forth the legal principles that govern our resolution of a claim of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Citations omitted.) Id., 32. If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, supra, 204 Conn. 540, whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair trial. See *State* v. *Schiavo*, 93 Conn. App. 290, 302, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006). These factors include the extent to which the impropriety was invited by defense conduct, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case. *State* v. *Williams*, supra, 540. Having set forth these legal principles, we now turn to the defendant's arguments.

A

The defendant first argues that the prosecutor acted improperly when he characterized the defendant's version of events as involving an act of prostitution because the defendant was not charged with prostitution. In a related claim, the defendant contends that the prosecutor, by using this improper characterization, was arguing implicitly to the jury that it "should convict [the

defendant] of a crime with which he was not charged—i.e., prostitution." We are not persuaded.

We conclude that, under the circumstances of the present case, the prosecutor's reference to "prostitution" was not improper. This characterization related directly to the evidence as well as to the defendant's version of events and his theory of defense, which were presented to the jury through the defendant's videotaped interview with Haas and Ricci of the Milford police department. The videotape and its accompanying transcript were admitted as full exhibits, without objection from the defendant. During the interview, the defendant told the police that he had an arrangement with Towne, in which Towne would pay him money after the defendant had participated in a homosexual act with Towne's acquaintance. The defendant also informed the police that, on August 17, 2004, he took the money because it was owed to him as payment for the sexual acts he had engaged in with another male. At trial, Haas testified, in response to multiple questions posed by the prosecutor and by defense counsel, about what the defendant had told him during the police interview, including how the defendant had made an arrangement for the performance of sexual services in exchange for money. Haas also characterized this type of arrangement as prostitution, without objection from the defendant. Defense counsel then asked Haas whether the defendant had been arrested for prostitution, to which Haas replied in the negative. Prostitution is defined as "[t]he act or practice of engaging in sexual activity for money or its equivalent . . . ." Black's Law Dictionary (7th Ed. 1999). The evidence adduced at trial and, indeed, the version of events advanced by the defendant are consistent with this definition. See generally *State* v. *Alvarez*, 95 Conn. App. 539, 553, 897 A.2d 669, cert. denied, 279 Conn. 910, 902 A.2d 1069 (2006). Accordingly, the defendant has failed to demonstrate

how the prosecutor's reference to prostitution was improper.

Further, we disagree with the defendant's assertion that the challenged remark was an implicit argument to the jury that it "should convict the defendant of . . . prostitution." The prosecutor's statement was not of such character that the jurors reasonably would understand it to be a comment directing them to find the defendant guilty of prostitution. Here, the prosecutor merely was responding to the defendant's theory of defense and arguing why such a defense was untenable. We therefore conclude that the defendant's argument fails.

B

The defendant's last contention amounts to a claim that the prosecutor's comment during closing argument, in which he stated that prostitution was not a legal excuse, was a misstatement of the law. We disagree.

The defendant's theory of defense to the charge of robbery in the first degree was that he had a claim of right to the money because, pursuant to an arrangement with Towne, he had engaged in sexual services with another male on August 17, 2004, in exchange for that money. The prosecutor, in arguing that the jury should find the defendant guilty of robbery in the first degree, properly responded to the theory of defense advanced by the defendant. The challenged statement was an argument by the prosecutor that an alleged entitlement to money as payment for sexual activities could not be a valid defense to robbery in the first degree. We conclude that this remark was not improper.

In so concluding, we find instructive our Supreme Court's decision in *State* v. *Morant*, 242 Conn. 666, 701 A.2d 1 (1997). In *Morant*, the defendant and a participant, after fatally shooting the victim, took cocaine and

money made from the sale of cocaine from the victim's apartment. Id., 669. The defendant later was convicted of felony murder, predicated on robbery. Id., 670. On appeal, to support his claim of insufficiency of the evidence, the defendant asserted that he had not engaged in a robbery. Id. Specifically, the defendant claimed, as a defense, that he had a legal right to recover the cocaine and the money that belonged to him. Id. Our Supreme Court disagreed with the defendant and stated that "a person commits a robbery when he forcibly takes contraband from another person's possession. We find that it would be contrary to our statutes and absurd to hold that the defendant cannot be convicted of robbery in the first degree when he takes contraband from another person." Id., 672. The court further stated that several courts from other jurisdictions have held that a person cannot use force to collect illegal debts from another person, noting that "[f]or the law to approve the collection of an illegal obligation would serve only to encourage the use of violence in the collection of such debts . . . ." (Internal quotation marks omitted.) Id. Accordingly, under the circumstances of the present case, we conclude that it was not improper for the prosecutor to argue to the jury that the defendant's version of events, which consisted of, inter alia, an alleged entitlement to the money as a result of his engagement in sexual activity with another male, could not support a claim of right defense to the charge of robbery in the first degree.

### III

The defendant last claims that the court's instruction to the jury concerning consciousness of guilt was not supported by the evidence and, therefore, was improper.[4] We are not persuaded.

---

[4] The court charged in relevant part: "In any criminal trial it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may fairly have been influenced by the criminal act; that is, the conduct or statements show a consciousness of guilt.

The following facts are relevant to our resolution of the defendant's claim. On December 27, 2004, Aponte, having recognized the defendant from a photograph taken from the surveillance videotape, contacted the police with information that the defendant was at Romantix. Several members of the Milford police department responded to the call and, upon arriving at Romantix, learned that another male, in addition to the defendant, might be present in the video booth area of the store. The officers located the video booth, in which the defendant and a partially undressed male were present. Thereafter, the police questioned the defendant about his possible involvement in the robbery of Romantix that occurred on August 17, 2004, and showed the defendant the photograph taken from the surveillance videotape. In response, the defendant stated that, although he previously had been in Romantix, he had not committed the robbery.

The defendant, who did not have any official identification on his person, initially stated that his name was Brent Carlson and that he was born on December 31, 1979. The police, when verifying the accuracy of that information, discovered that the defendant had provided an incorrect name and date of birth. During this time, Officer Anderson spoke with the defendant's mother on the defendant's cellular telephone. The defendant's mother told Anderson that the defendant's name was Brent Pascal and that he had a date of birth of December 31, 1983.

"In this case, you have heard evidence that the defendant gave a false name and date of birth when questioned by the Milford police on December 27, 2004. First, you must determine whether the state has proven such statements, and, if so, that any proven statement was false. You must then find proven that the defendant made such statements in connection with the crime. Such statements tend to show a consciousness of guilt. They do not, however, raise a presumption of guilt.

"It is up to you as the judges of the facts to decide whether statements or conduct of the defendant reflect consciousness of guilt and to consider in your deliberations in conformity with these instructions."

"The decision to give a consciousness of guilt instruction is left to the sound discretion of the trial court. *State* v. *Scott*, 270 Conn. 92, 104, 851 A.2d 291 (2004) [cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005)]. We review the defendant's claim under this standard." *State* v. *Hinds*, 86 Conn. App. 557, 565, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005).

"A trial court may admit [e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, [which] is ordinarily the basis for a charge on the inference of consciousness of guilt. . . . In seeking to introduce evidence of a defendant's consciousness of guilt, [i]t is relevant to show the conduct of an accused . . . as well as any statement made by him subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act. . . . [M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Jimenez*, 74 Conn. App. 195, 212, 810 A.2d 848 (2002), cert. denied, 262 Conn. 947, 815 A.2d 677 (2003); see also *State* v. *Oliveras*, 210 Conn. 751, 759, 557 A.2d 534 (1989); *State* v. *Burak*, 201 Conn. 517, 533, 518 A.2d 639 (1986). "The assumption of a false name . . . obviously constitutes consciousness of guilt evidence." *State* v. *Bell*, 188 Conn. 406, 412, 450 A.2d 356 (1982).

"Once the evidence is admitted, if it is sufficient for a jury to infer from it that the defendant had a consciousness of guilt, it is proper for the court to instruct the jury as to how it can use that evidence. It is then for the jury to consider any ambiguity in the evidence." *State* v. *Aleksiewicz*, 20 Conn. App. 643, 652, 569 A.2d

567 (1990); see also *State* v. *Scott*, supra, 270 Conn. 105–106 (court within discretion giving instruction where reasonable view of evidence supports inference that defendant wanted to evade detection).

The defendant argues that the court's instruction on consciousness of guilt was improper because his "misstatements as to his last name and date of birth could not reasonably give rise to an inference of consciousness of guilt" regarding the charge of robbery in the first degree because the "misstatements were made in the course of an investigation which the defendant believed was related to public sexual acts and that had nothing to do with a robbery." We reject this argument.

In the present case, the evidence demonstrated that the defendant had provided the police with an incorrect name and date of birth. Although the police had located the defendant on December 27, 2004, in a video booth with a partially undressed male, Officer Rahn testified before the jury that the police had informed the defendant at that time that they wanted to question him about his possible involvement in the robbery of Romantix that occurred on August 17, 2004. Rahn's testimony also indicated that the police had showed the defendant a photograph taken from the August 17, 2004 surveillance videotape. In addition, the defendant, in the videotaped interview with the police following his arrest, stated that when the police arrived at Romantix on December 27, 2004, the officers informed him first that Romantix had been robbed and also showed him a picture from the surveillance videotape. On the basis of this evidence, we cannot conclude that the court abused its discretion by charging the jury on consciousness of guilt. The jury was free to draw any reasonable inferences from the testimony and was left to determine whether the defendant's initial statements relating to his name and date of birth were false and whether they were made in connection with the August 17, 2004

robbery. Accordingly, we conclude that the court did not abuse its discretion by instructing the jury on consciousness of guilt.

The judgment is affirmed.

In this opinion the other judges concurred.