STATE OF CONNECTICUT *v.* WILLIE A. SAUNDERS
(AC 28596)

Harper, Beach and West, Js.

Argued February 4—officially released May 19, 2009

*Arthur L. Ledford*, special public defender, for the appellant (defendant).

*Melissa Patterson*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, *Amy Sedensky*, senior assistant state's attorney, and *Don E. Therkildsen, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Willie A. Saunders, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2)[1] and risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[2] On appeal, the defendant claims that (1) the state adduced insufficient evidence to sustain his conviction, (2) the trial court improperly allowed the state to comment on missing witnesses during final argument and (3) the state engaged in prosecutorial impropriety during final argument and, therefore, deprived him of his

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[2] General Statutes § 53-21 (a) (2) provides in relevant part that a person is guilty of risk of injury to a child when he "has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . ."

due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 20, 2003, Easter Sunday, the victim,[3] who was ten years old at the time, and several members of her family, as part of their living arrangements, were staying with the defendant's sister, Ella Saunders, in her apartment. Also present, among others, were Walter Saunders, the defendant's brother, who was dating the victim's mother, the defendant's mother, Maggie Saunders, the defendant, and Ella Saunders' children, Asia, Nisa, Delvin and Devante. The sleeping arrangements were such that the victim shared a room with her five year old brother, C, and Asia. On that night, the victim shared a twin bed with her brother; he slept at the head and she at the foot of the bed, while Asia slept on the floor. The victim slept on her stomach, still dressed in her Easter dress with her undergarments and shoes on. At some point, the defendant entered the room and shook the victim's arm, telling her that her mother wanted her. The victim feigned sleep and ignored the defendant, who then went into the hall outside the room. Once there, the defendant had a brief conversation with someone who then went downstairs.[4]

The defendant reentered the room and approached the victim, who was still feigning sleep, face down on the bed. He pulled down her undergarments and left the room again. He soon returned and removed C from the twin bed he was sharing with the victim and placed

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] During direct examination, the victim stated that it was a female with whom the defendant spoke in the hallway. During cross-examination, however, the victim stated that she did not know if the person with whom the defendant spoke to in the hall was a man or a woman.

him on the floor. C did not awaken. The defendant then inserted his penis into the victim's vagina. The defendant had lubricated his penis with shampoo that burned the victim's vagina. The defendant then tried to insert his penis fully into the victim's vagina for five minutes to no avail. During the assault, the victim continued to feign sleep in fear that had she not, the defendant would have physically assaulted her. After ending his efforts, the defendant pulled the victim's undergarments back up, placed C back on the bed and left the room. Neither of the children sharing the room with the victim awoke during the incident. The next morning, the victim awoke before anyone in the house and went into the bathroom that was located next to the bedroom she slept in. The victim saw a bottle of shampoo placed on the toilet and started to cry. The victim did not immediately report the assault.

On October 29, 2003, the victim was at home with C and her older brother, D, while their mother was at work.[5] She and D were watching the movie "The Color Purple" on television. In the movie, there is a scene in which a character is raped by her father and becomes pregnant. After viewing the movie, the victim had a violent outburst in which she destroyed several glass figurines and other items she kept in her bedroom. D intervened, asking the victim what was wrong with her. The victim told D that the defendant had raped her. D then called their mother and reported to her what the victim had told him. The victim's mother came home and called the police. Joann Sodan, a police officer, arrived at the scene and interviewed the victim. The victim reported to Sodan that the defendant had raped her on Easter Sunday, 2003. She also told Sodan that during the assault, she lay face down on her stomach. Subsequently, the victim picked the defendant's photograph out of a photographic array at the police department. The defendant was charged by substitute long

[5] The victim and her family had moved to another residence.

form information with sexual assault in the first degree and risk of injury to a child. After a trial to the jury, the defendant was found guilty of both crimes. The court imposed a total effective sentence of ten years imprisonment followed by fifteen years of special parole. This appeal followed.

I

The defendant claims first that there was insufficient evidence to support his conviction of both charges because the state failed to prove beyond a reasonable doubt that he was the perpetrator of the assault. In other words, the defendant claims that by itself, the victim's identification of him as the perpetrator, under the circumstances, fails to establish beyond a reasonable doubt his identity as the perpetrator. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . .

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt

beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Furthermore, [i]n our review of the evidence to determine its sufficiency, we do not look at the evidence to see whether it supports the defendant's innocence. . . . Instead, our focus is whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Fleming*, 111 Conn. App. 337, 342–43, 958 A.2d 1271 (2008), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009).

The defendant claims essentially that the victim's identification of him as the perpetrator of the assault against her is insufficient as a matter of law to support his conviction of these crimes. He argues that because there was no physical evidence or any corroborating witness and the assault took place in a dark room, just after the victim woke up and while the victim remained face down feigning sleep, the victim lacked the opportunity to observe him and, thus, accurately to identify him as the person who assaulted her. The defendant bolsters this claim by arguing that the assault took place in a room with two sleeping children, in a house full of people just after the victim heard the defendant converse with another party in the hallway and that it is just as likely that this other person committed the assault rather than the defendant. Moreover, the defendant contends, the victim's identification is based on her conclusion that it was the defendant who assaulted her as opposed to what she actually saw.

Although the defendant couches his argument in terms of insufficiency of the evidence, he confuses,

however, the issues of sufficiency and credibility. As just noted, "[o]ur task is to view the evidence in the light most favorable to sustaining the verdict before determining if the jury reasonably could have concluded that such evidence established guilt beyond a reasonable doubt. . . . We assume that the jury credited the evidence that supports the conviction if it could reasonably have done so. Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Osoria*, 86 Conn. App. 507, 514–15, 861 A.2d 1207 (2004), cert. denied, 273 Conn. 910, 870 A.2d 1082 (2005).

We note, that although "[i]t is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as one of the perpetrators of the crime charged"; (internal quotation marks omitted) *State* v. *Fleming*, supra, 111 Conn. App. 343; "it is for the trier of fact to determine the weight to be given [an] identification." *State* v. *Morgan*, 274 Conn. 790, 802, 877 A.2d 739 (2005). Although the victim did not report the assault immediately, the testimony reveals that she consistently reported—to family, law enforcement and an examining physician—that it was the defendant who assaulted her. Moreover, she chose the defendant from a police photographic array and identified him in court as the person who assaulted her. See id. ("in-court identifications . . . [are] sufficient evidence by themselves to allow the trier of fact to conclude that it was the defendant who committed the crimes charged"). On the record before us, the jury was free to credit the victim's

testimony. Because we cannot decide issues of credibility, the defendant's claim must fail.

## II

Next, the defendant claims that the court improperly allowed the state to comment on missing witnesses during final argument. Specifically, the defendant contends that (1) there was no factual basis for the state to comment on one missing witness in particular, (2) the testimony of the missing witnesses would have been cumulative and allowing the state to comment on them was an abuse of discretion and (3) the state's comments exceeded the scope of permissible comments allowed under *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000).[6] We conclude that these

[6] "In *Malave*, our Supreme Court abandoned, in criminal cases, the [rule of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960)], also known as the missing witness rule, which sanctioned, under certain circumstances, a jury instruction that an adverse inference may be drawn from the failure of a party to produce a witness. Although our Supreme Court abandoned the *Secondino* rule, it did not intend to 'prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case.' [*State* v. *Malave*, supra], 739. Comments in closing argument that do 'not directly exhort the jury to draw an adverse inference by virtue of the witness' absence' do not necessarily fall under the ambit of *Secondino*; id.; and accordingly are not forbidden by *Malave*. Our Supreme Court further provided that '[o]f course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue.' " *State* v. *Graham*, 67 Conn. App. 45, 48–49, 787 A.2d 11 (2001), cert. denied, 259 Conn. 911, 789 A.2d 996 (2002). Furthermore, "[c]ounsel may comment [in closing argument] upon facts properly in evidence and upon *reasonable* inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest [in closing argument] an inference from facts not in evidence. . . . Similarly, a party cannot merely comment on the failure of the opposing party to present a witness without first providing a factual or evidentiary foundation from which to infer a weakness in the opposing party's case." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 49–50.

issues were not preserved at trial and, accordingly, do not reach the merits of this claim.

During the trial, Elizabeth Rhodes testified that the defendant was at her home in North Carolina on April 20, 2003. She testified that the defendant showed up at her house with his infant son sometime in the morning and stayed all day. She testified that her son-in-law, Bruce Bulla, and stepdaughter, Anitra Bulla, were present when the defendant arrived and that they all spent the holiday together having a cookout. She also testified that the defendant stayed until just before dark. There was also testimony from Rhodes that indicated that her husband was present in the home while the defendant and his infant son were there.[7] The defendant did not call any of these individuals to testify as witnesses. The state asked the court's "permission during [its] rebuttal closing argument to comment on certain—the absence of certain witnesses and [assured the court that its] argument will go no further than that."[8] The defendant objected to the state's request as follows: "[T]here's probably two different issues. Regarding the comments with regard to [Rhodes' testimony], I think she said her stepdaughter or others who were down in North Carolina, it's probably fair game to say that from all the people that were there, only [Rhodes] testified. That's simply a fact. To say that [the defendant] could have produced, it's just as difficult for us to produce [a potential witness from North Carolina] on short notice . . .

---

[7] See part III.

[8] Upon the court's request, the state clarified what it was seeking permission to say in its closing argument: "I want to state essentially that other than [Rhodes' testimony], there's—there's no other corroborating evidence to support [that] testimony [and] that Maggie Saunders, Ella Saunders, Walter Saunders, Theresa Saunders, [Rhodes'] husband . . . stepdaughter and son-in-law all were absent and did not testify in this case, and that's where my comments will end because I—I don't think I can go any further than that.

"And the [*Malave* decision] indicates that if it is a party who the—who, in this case, the defendant had in his power to produce and would naturally have produced, I think I can, under [*Malave*] comment just on the absence of those parties."

as it is for the state to get [another potential witness from North Carolina] here. Now, as for the other witnesses that were relatives of [the defendant] here [in Connecticut] . . . they were on the state's witness list and they didn't produce them." It seems that the defendant's arguments were twofold: (1) that the missing North Carolina witnesses would have been difficult to produce; and (2) that the missing local witnesses, members of the defendant's family, were on the state's witness list, the state failed to call them as witnesses, and therefore the state should be precluded from commenting on the defendant's failure to call any of the witnesses.

The court, after reviewing *Malave*, allowed the state only to "comment [in closing argument] insofar as the—those witnesses reflect on the weakness of the opposing party's alibi. So, [the state will] have to confine [itself] to drawing attention to the absence of those people. . . . Those named people. And under *Malave*, I think this is allowed. I think [the state] followed the proper procedure for notifying the bench and [the defendant that it] intend[s] to argue this. . . . And I've noted [the defendant's] objection." In its rebuttal closing argument, the state made the following comments: "[L]et's talk about Rhodes' testimony. Was that testimony corroborated? We did not hear from her husband. Her husband was seated in the back room of the courthouse—of the courtroom—the backseat of the courtroom.[9] She testified he saw [the defendant] that day.

[9] Testimony that took place in the presence of the jury indicates that Rhodes' husband was in the courtroom during the defendant's trial. During the defendant's direct examination of Rhodes, the following exchange occurred:

"Q. First things first. Who—who's this gentleman in the back who's smiling at you?

"A. That's my husband.

"Q. Okay. And in fact, he accompanied you up here from North Carolina this morning, did he not?

"A. Yes, sir."

Did we hear from him? We didn't hear from him. She talked about her; I think she said [that her] stepdaughter and son-in-law were present as well. We didn't hear from them, either, and I believe her testimony was, 'I would have brought them.' She didn't bring them. We didn't hear from them. And this is a woman who has six children, ten grandchildren, big in the community, and those were the only people who were at her house that day and we did not hear from them.

"Corroboration could have also come from members of the defendant's family themselves. You heard [the state's] witnesses say that Easter [Sunday] 2003 or that during week, Ella Saunders, Theresa Saunders, Maggie Saunders [and] Walter Saunders were all present that day. That's the testimony you heard from the state's witnesses [who] were present on [April 20, 2003] and resided in that house. We didn't hear from any of those people, and, as we know, Maggie Saunders has been in the courtroom every day since we started this trial. Did we hear from her? We did not." The defendant did not make any further objection at any time subsequent to these statements or request a curative instruction.

On appeal, the defendant makes three arguments concerning these comments made by the state during final argument. First, the defendant contends that there was no factual basis for the state's commenting on Rhodes' husband's not testifying because the evidence established that he had not returned from work prior to the defendant's leaving the Rhodes' residence. Second, the defendant argues that the testimony of the potential North Carolina witnesses would have been cumulative, and, therefore, allowing the state to comment on the missing witnesses was an abuse of discretion. Last, the defendant argues that the state's comments exceeded the scope of permissible comments allowed under *Malave* by implicitly and improperly inviting the jury to draw an adverse inference that the testimony of

Rhodes' husband would not have supported the defendant's alibi.

"Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Stenner*, 281 Conn. 742, 755, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007); see also Practice Book § 60-5.[10] At trial, the defendant's objections were based on the difficulty in getting the North Carolina witnesses to Connecticut and the fact that the state did not call as witnesses the members of the defendant's family that it wanted to comment on. On appeal, the defendant is abandoning those arguments in favor of the three arguments detailed previously.[11] "Inasmuch as the defendant raises a claim on appeal different from the one that he raised at trial, he is not entitled to review of his claim." *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003). Accordingly, the defendant's claim fails.[12]

---

[10] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

[11] The defendant also requested review of this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), but did not provide adequate analysis of it under *Golding*'s four-pronged test. "[C]laims on appeal that are inadequately briefed are deemed abandoned. . . . This rule applies to claims that the defendant is entitled to . . . *Golding* review." (Internal quotation marks omitted.) *State* v. *Miller*, 59 Conn. App. 406, 410, 757 A.2d 69 (2000), cert. denied, 255 Conn. 942, 769 A.2d 60 (2001). Accordingly, we decline to afford the defendant's claim *Golding* review.

Moreover, although the defendant characterizes his claim as constitutional, it is clear that it involves an evidentiary, rather than a constitutional, issue. See *State* v. *Malave*, supra, 250 Conn. 738.

[12] Even if we assume arguendo that the defendant preserved his claim properly, he could not prevail because he has failed to establish that the court abused its discretion in allowing the state to make the comments at issue. As this court has stated: "The broad discretion vested in trial courts

## III

The defendant next claims that the state engaged in prosecutorial impropriety during final argument and, therefore, deprived him of his due process right to a fair trial. We disagree.

The defendant concedes that he did not object to the alleged instance of prosecutorial impropriety at trial. "Once prosecutorial impropriety has been alleged, however, it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Internal quotation marks omitted.) *State* v. *Pascal*, 109 Conn. App. 55, 66, 950 A.2d 566, cert. denied, 289 Conn. 917, 957 A.2d 880 (2008). Furthermore, "[i]n analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine

by *Malave* mirrors the general standards regarding the trial court's ability to limit closing argument. [T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations." (Internal quotation marks omitted.) *State* v. *Graham*, 67 Conn. App. 45, 49, 787 A.2d 11 (2001), cert. denied, 259 Conn. 911, 789 A.2d 996 (2002). Our review of the record and briefs indicate that the defendant has failed to establish an abuse of discretion by the court.

whether it deprived the defendant of his due process right to a fair trial. . . . If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, supra, [540], whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair trial. . . . These factors include the extent to which the impropriety was invited by defense conduct, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Pascal*, supra, 67. We now turn to the defendant's argument.

As noted previously, in its rebuttal final argument, the state made the following comments: "[L]et's talk about Rhodes' testimony. Was that testimony corroborated? We did not hear from her husband. Her husband was seated in the back room of the courthouse—of the courtroom—the backseat of the courtroom. She testified [that] he saw [the defendant] that day. Did we hear from him? We didn't hear from him."[13] The defendant argues that the statement—"[s]he testified [that] he saw [the defendant] that day"—alluded to facts that were not in evidence and, thus, constituted prosecutorial impropriety. The state counters that it confined its rebuttal argument properly to evidence adduced at trial and the reasonable inferences drawn therefrom. It is the following exchange that is at the crux of the defendant's claim, which took place during the state's cross-examination of Rhodes:

"Q. So, then what did you do after [the defendant] left?

---

[13] See footnote 9. Also, the defendant has not claimed on appeal that this factual assertion by the state amounted to prosecutorial impropriety.

"A. I was waiting for my husband to come home

"Q. And what time does your husband get home?

"A. He got home—well, he got most time—a twelve to fourteen hour shift sometimes.

"Q. So, you—do you recall what time your husband came home on Easter of 2003?

"A. Right before dark. That's all.

"Q. Right before dark? Was [the defendant] still there when your husband came home?

"A. Yeah.

"Q. Was the baby still there?

"A. He left with the baby."

The defendant argues that this exchange supports the conclusion that Rhodes' husband did not see the defendant at his home on April 20, 2003, and, therefore, the defendant was deprived of a fair trial because the prosecutor improperly referred to facts that were not in evidence during final argument. The defendant contends that Rhodes' affirmative response to the questions "Right before dark? Was [the defendant] still there when your husband came home?" was merely an answer to the first question, leaving the second question unanswered. Therefore, the defendant asserts, the evidence supported a finding that Rhodes' husband did not arrive home until after the defendant left and was not a witness who could have supported his alibi. On this basis, the defendant argues that the state's contention otherwise—that he saw the defendant that day—amounted to prosecutorial impropriety. The state, however, counters that this very exchange supports the opposite conclusion. The state contends that Rhodes' testimony is merely inconsistent on the subject and supports the conclusion that her husband did arrive home from work

that day while the defendant was present, and, as a result, it is reasonable to infer that he would have seen the defendant at his home in North Carolina on April 20, 2003, and could have testified in support of the defendant's alibi.

As noted, the first step in our analysis is to determine whether the prosecutor's statements properly can be characterized as an impropriety. In so doing, we must bear in mind that "a prosecutor properly may ask the jury to draw reasonable inferences based on the evidence at trial." *State* v. *Batista*, 101 Conn. App. 623, 635, 922 A.2d 1116, cert. denied, 284 Conn. 918, 933 A.2d 721 (2007). We conclude that the statements claimed by the defendant to amount to prosecutorial impropriety were arguments presented by the state during its final argument that were based on reasonable inferences drawn from the evidence in the case. To be sure, Rhodes' testimony about the timing of her husband's return from work on that day is not the picture of clarity.[14] We cannot conclude, however, as the defendant urges us, that this testimony *categorically* establishes that Rhodes' husband did not arrive home until after the defendant left and therefore did not see the defendant that day. This inconsistent testimony simply does not warrant such a categorical, one-sided conclusion. Although the inference that Rhodes' husband did *not* arrive home while the defendant was still present is supported by Rhodes' testimony, this circumstance alone does not foreclose the contradictory inference from being drawn reasonably from this inconsistent testimony. A conclusion supported plausibly by the testimony of Rhodes, on the record before us, is that her husband did arrive home before the defendant left, and, on that basis, it is a reasonable inference that he did

---

[14] We note that at no time did the defendant attempt to clarify the testimony of Rhodes by further questioning her during redirect examination or otherwise attempt to resolve the inconsistency in her testimony.

see the defendant that day. Accordingly, we conclude that the statements made by the state during its rebuttal final argument cannot be characterized properly as prosecutorial impropriety.

The judgment is affirmed.

In this opinion the other judges concurred.