STATE OF CONNECTICUT *v.* JACOB CARATTINI
(AC 33909)

Bear, Espinosa and Flynn, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 7—officially released May 14, 2013

*Robert E. Byron*, assigned counsel, for the appellant (defendant).

*C. Robert Satti, Jr.*, supervisory assistant state's attorney, with whom, on the brief, was *John C. Smriga*, state's attorney, for the appellee (state).

FLYNN, J. The defendant, Jacob Carattini, appeals from the judgment of conviction, rendered after a jury trial, of one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48[1] and 53a-54a (a).[2] On appeal the defendant claims that the trial court erred in (1) not giving a cautionary jury instruction with respect to the testimony of a witness whom the defendant characterizes as a jailhouse informant and (2) admitting the alleged hearsay testimony of another witness under the hearsay coconspirator exception. We disagree and, accordingly, affirm the judgment.

The jury reasonably could have found the following facts, which are relevant to this appeal. The victim, Jose Suarez, also known as Green Eyes, and the defendant were acquaintances, who were often seen together. The victim sold drugs for the defendant. The defendant believed that the victim was responsible for stealing $10,000 worth of heroin and a firearm from him and was heard saying "he was gonna make an example out of [the victim]."

The body of the victim was discovered in Lakeview Cemetery in Bridgeport, on the morning of October 18, 2008. The victim suffered blunt force trauma to his person and died of a gunshot wound to the head. Thereafter, the defendant was arrested and charged with murder in violation of § 53a-54a (a) and conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a

---

[1] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy . . . ."

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

(a) in connection with the victim's death. The jury found him guilty of the count of conspiracy to commit murder, but the court declared a mistrial on the count of murder after the jury was unable to reach a unanimous verdict. The trial court rendered judgment accordingly. This appeal followed.

## I

We first address the defendant's claim that the court erred in not giving a special cautionary jury instruction with respect to the testimony of a witness whom the defendant characterizes as a jailhouse informant. On appeal, the defendant claims that witness Anthony Lopez was a "jailhouse informant" and, thus, under *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), and *State* v. *Arroyo*, 292 Conn. 558, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), the jury should have been instructed that Lopez' testimony should have been considered with particular scrutiny. We are not persuaded.

The following additional facts reasonably could have been found by the jury and the following procedural history is relevant to this claim. In 2008, Lopez was living with the defendant and selling drugs for him. Lopez was arrested in October, 2008, for the sale of narcotics and in April, 2009, for selling narcotics to an undercover police officer. Approximately one week before the victim was murdered, there was a baby shower that the defendant, the victim and Lopez attended. After the shower, the defendant told Lopez that "someone went to the basement [of the defendant's residence] and stole a .40 caliber pistol and . . . [forty] bricks of dope . . . ." Lopez further testified about a later conversation with the defendant in which the defendant relayed a conversation that he had had with the victim. The defendant told Lopez that when the defendant confronted the victim "[the victim] asked,

oh, did they take the gun? And then that's when [the defendant] started thinking [the victim] had something to do with it."

Lopez was at the apartment that he shared with the defendant on the night of the murder, October 17, 2008. He testified that around 10 or 10:00 p.m., the defendant and an associate, known as Pukee,[3] entered through the rear entrance to the apartment wearing jeans and black hooded sweatshirts. Lopez observed that the defendant and Pukee were acting nervously and pacing around. He further testified that the defendant and Pukee removed the clothes that they were wearing and placed them in a garbage bag. Furthermore, Lopez testified that he saw a drop of blood on one pair of the jeans. Lopez, at the direction of the defendant, went with two other people who were present in the apartment at that time to dispose of the garbage bag of clothes.

Later that night when Lopez returned to the apartment, the defendant was not there, but subsequently returned about one-half hour afterward. The defendant was "pacing back and forth" and said, "[O]h, this nigga dead. Oh, this nigga dead." Lopez testified that the defendant clarified that "[the victim] is dead right now." He further stated that a couple days later the defendant described details of the murder. Lopez stated that the defendant told him that "when [the defendant, Pukee, Lulu,[4] Bebo[5] and Mike Cruz] was in the—the cemetery and they was questioning [the victim] once he started they—one of them swung on him and they all continued to beat on him." Then Lopez testified that the defendant described to him the actual shooting and last breath of the victim. The defendant also told Lopez how he and

---

[3] Pukee's full name is unclear from the record, but there was evidence that his first name is Raymond and he is the nephew of Mike Cruz.

[4] Lulu's full name is not clear from the record.

[5] Bebo's full name is Pedro Deleon.

Cruz were able to get the victim into their vehicle at gunpoint.

Lopez did not divulge this information to the police when he saw them at the victim's house the day that the victim's body was discovered because he feared retaliation from the defendant. When Lopez was arrested on February 19, 2009, he did not make bond and was transported to Bridgeport correctional center (jail). While in jail, Lopez requested to speak to police officers from the Bridgeport police department regarding the victim's murder. Lopez spoke to two police officers while in jail and then was released on a promise to appear. The second time Lopez spoke to the police officers, at the Bridgeport courthouse, he made a written statement. While Lopez was out on release based on his promise to appear, he testified that he did "favors" for the drug enforcement administration and the homicide division of the Bridgeport police department. In April, 2009, Lopez, the defendant and three other associates were arrested. First, Lopez was interviewed at the Bridgeport police department tactical narcotics team station, and, then, he was transferred and interviewed at Bridgeport police headquarters later in the day. Lopez was then in jail from the April, 2009 arrest until August 13, 2009, when he was released on another promise to appear. After this release, Lopez went with his lawyer's investigator on a trip to New York in an unsuccessful attempt to identify where he dumped the garbage bag of clothes.

Our Supreme Court has placed great emphasis on the need for a cautionary instruction regarding the testimony of jailhouse informants. See *State* v. *Patterson*, supra, 276 Conn. 470; see also *State* v. *Arroyo*, supra, 292 Conn. 569. The record does not show any preservation of any request by the defendant for a jailhouse informant instruction either by a request to charge or an exception to the charge as given, omitting any such

cautionary instruction. The defendant concedes this. The defendant now seeks review of this unpreserved issue under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *Golding* review, however, requires that the issue be of constitutional magnitude. Id., 239. Evidentiary issues are not of constitutional magnitude. "[B]ecause an instructional error relating to general principles of witness credibility is not constitutional in nature . . . the defendant would not be entitled to review of any such claim under . . . *Golding* . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, 302 Conn. 93, 114, 25 A.3d 594 (2011). The defendant also does not request plain error review.

"In certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the *Golding* or plain error doctrines." *State* v. *Ramos*, 261 Conn. 156, 172 n.16, 801 A.2d 788 (2002). In light of *Patterson* and *Arroyo*, we exercise our inherent supervisory power to review the defendant's claim.

In reviewing a claim concerning the court's failure to give a cautionary instruction, our Supreme Court set forth the following principles to guide our review: "[A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 566.

In *Patterson*, our Supreme Court concluded that the trial court should give a special credibility instruction to the jury when a jailhouse informant "has been promised a benefit by the state in return for his or her testimony . . . ." *State* v. *Patterson*, supra, 276 Conn. 469. In *Arroyo*, our Supreme Court expanded upon *Patterson* and held that "[i]n light of . . . the inherent unreliability of jailhouse informant testimony . . . the trial court should give a special credibility instruction to the jury whenever such testimony is given . . . ." *State* v. *Arroyo*, supra, 292 Conn. 569. The record, however, is clear that, despite the defendant's characterization of Lopez as a jailhouse informant, he did not meet our Supreme Court's definition of a jailhouse informant. In *State* v. *Diaz*, supra, 302 Conn. 102, our Supreme Court defined a jailhouse informant subject to the special credibility instruction as "a prison inmate who has testified about confessions or inculpatory statements made to him by a fellow inmate. . . . *Patterson* has not been applied to require a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that he or she witnessed outside of prison, as distinct from confidences that the defendant made to the witness while they were incarcerated together." (Citation omitted.)

*Diaz* is applicable here. First, Lopez was not an inmate when he gave his testimony. Lopez had been released from jail on multiple promises to appear prior to testifying in the trial. Lopez, therefore, was not an incarcerated witness when he testified. Second, and more important, Lopez' testimony did not include confessions or inculpatory statements made by a fellow inmate. Lopez' testimony encompassed statements that the defendant had made to him prior to the victim's murder, statements that the defendant made to him after the victim's murder when both were living together in the same apartment prior to the defendant's arrest

and Lopez' observations and recollections of the events surrounding the murder. None of the defendant's statements to which Lopez testified were made while the defendant and Lopez were incarcerated together. In fact, none of the defendant's statements to which Lopez testified were made while either of them were inmates in jail. Third, the general content of Lopez' testimony concerned events surrounding the crime that he witnessed outside of jail, not "confidences that the defendant made to [him] while . . . incarcerated . . . ." Id.

"Testimony by a jailhouse informant about a jailhouse confession is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence. . . . In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested. . . . [W]hen a witness is not incarcerated, but is merely on parole or subject to pending charges, the special concerns relating to incarcerated witnesses do not come into play." (Citations omitted.) Id., 109–10. Therefore, in accordance with *Patterson* and *Diaz*, Lopez was not a jailhouse informant, such that his testimony would require the court to provide a special credibility instruction.

What the defendant really seeks is an extension of *Patterson* and *Arroyo* that would require that the jury be advised with a special cautionary jailhouse informant instruction even when a state's witness has testified about events he observed and the defendant's statements were made before the defendant's arrest, even if the state's witness is not in jail, but already has allegedly received favorable bond treatment and a promise of

favorable treatment for his own sentencing. This we decline to do. Unlike an incarcerated prisoner who may conform testimony regarding comments or confidences that the defendant made to him while they were incarcerated together in the hope of winning some future leniency, the record here was clear that the statements were made while both Lopez and the defendant were not incarcerated, and that Lopez already had expected and received lenient pretrial release treatment for his testimony. See *State* v. *Ebron*, 292 Conn. 656, 675 n.17, 975 A.2d 17 (2009), overruled on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 472–73, 10 A.3d 942 (2011).

Furthermore, our Supreme Court in *Diaz* held that a general credibility instruction coupled with the jury's awareness of the witness' involvement in the criminal justice system and expectations as to what he or she would receive in exchange for his or her testimony were sufficient for nonjailhouse informant witnesses. *State* v. *Diaz*, supra, 302 Conn. 103–104. The defense counsel was free to argue before the jury that Lopez' testimony should be viewed by the jury in light of his self-interest, and the defense counsel did so effectively. The defense counsel's cross-examination of Lopez brought to the jury's attention his possible motives for falsifying his testimony. The cross-examination of Lopez brought out that he was released from jail, he had asked the police for help in getting released, he had asked the police to falsify documents so that the public would not know that he had not posted bond, he hoped that the defendant would be incarcerated for life and the police wanted favors from him. The defense counsel also developed Lopez' testimony during cross-examination to show that although he was facing a maximum of forty years in jail, including two five year minimum mandatory terms, he hoped to avoid jail entirely through his cooperation in the prosecution of the defendant and assistance to the federal Drug

Enforcement Administration. In his closing argument, the defense counsel argued that, despite the fact that several individuals, including Lopez, had been arrested together, Lopez had been released from jail on his promise to appear because he gave the police "more information."[6] The defense counsel strongly emphasized to the jury that, while others were in pretrial detention, the defendant was free and had a motivation to lie.

The court also gave a general instruction on credibility of witnesses as part of its final charge to the jury, in which, inter alia, they were told to consider any interest, bias, prejudice or sympathy that a witness may apparently have for the state.[7] The jury was also

[6] During his closing argument, the defense counsel stated in relevant part: "Don't believe a word [Lopez] said. You can't believe a word this guy said. What did he tell—he had cases pending, right. And of those guys who all got arrested together, remember they got arrested together and said, Mr. Bou, Mr. Wertenburg—there was one other guy, Picart. They all got arrested together. What did those three guys have in common when they came in. They all kind of had the same outfit on; didn't they. Government issue, right. Not Mr. Swayze, not Mr. Lopez; he wasn't in jail. He came in street clothes, why; because he gave them more information. But what was his motivation to lie; you saw it, he's out. . . . You cannot—the judge is gonna tell you, you could choose to believe some, little, all, none of what any witness tell you if you think he lied. He lied, he's dishonest, he's got a motive to lie."

[7] The court's general credibility instruction to the jury included in relevant part: "Concerning the subject of credibility, by which I mean the believability of witnesses—of testimony. You have observed the witnesses. The credibility, the believability, of the witnesses and the weight to be given to their testimony are matters entirely within your hands. It is for you alone to determine their credibility. Whether or not you find a fact proven is not to be determined by the number of witnesses testifying for or against it. Again, it's the quality, not the quantity of testimony which has to be controlling. Nor is it necessarily so that you have to accept the fact as true because a witness has testified to it and no one contradicts it. The credibility of the witness and the truth of the fact are for you to determine.

"In weighing testimony of the witnesses, you should consider the probability or improbability of their testimony. You should consider their appearance, conduct and demeanor while testifying and in [c]ourt, and any interest bias, prejudice or sympathy which a witness may apparently have for or against the [s]tate, or the accused or in the outcome of the trial. You should measure the testimony of witnesses by the nature of human conduct, and if you find [there exists] any interest, bias or motive which impels or influences people

instructed to consider any interest, bias or motive that might impel the witnesses to speak or act. When the defense counsel was asked by the court if he had any comments on the charge prior to the court instructing the jury, he stated that he did not. The defense counsel only raised one objection after the court instructed the jury, but that objection related to the consciousness of guilt instruction, not the general credibility instruction or absence of a special credibility instruction. Although the court's instructions on witness credibility were general and did not call the jury's attention to any special caution to be employed in viewing Lopez' testimony, the court did not err. See *State* v. *Ebron*, supra, 292 Conn. 675 (not giving jailhouse informant instruction not error particularly when court instructed jury on credibility of witnesses, counsel made jury aware of witness' criminal history and counsel commented on inconsistencies between various witnesses' testimony). We therefore reject this claim.

## II

We next address the defendant's claim that the court erred when it allowed the testimony of Jose Feliciano under the coconspirator exception to the hearsay rule embodied in § 8-3 (1) (D) of the Connecticut Code of Evidence.[8] We are not persuaded.

The following additional facts and procedural history are relevant to this claim. Feliciano was a drug dealer

to speak or to act, you can consider the circumstances under which witnesses may have provided any information. The credibility of the witnesses is for you to decide based on all the evidence presented to you. . . .

"You should use all your experience, your knowledge of human nature, and of the motives that influence and control human conduct, and test the evidence against that knowledge."

[8] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (1) Statement by a party opponent. A statement that is being offered against a party and is . . . (D) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . ."

who sold drugs for the defendant. He testified that the defendant told him that the defendant needed the victim "taken out" because he had stolen drugs and a gun from the defendant. Feliciano further testified that the defendant offered him $10,000 to kill the victim.

Prior to Feliciano's testimony, the defense counsel filed and argued before the court a motion in limine, which sought to prevent Feliciano from testifying as to statements made to him by Cruz related to the murder. The court denied the motion in limine, and Feliciano testified as to this conversation. Specifically, Feliciano testified that in July, 2009, after the murder of the victim, "I said [to Cruz], you know [the police are] looking for you for that body, right . . . . He said, yeah, but we got rid of the gun and the car." Feliciano's statement was admitted by the court under two hearsay exceptions, namely, as a statement against penal interest, codified under § 8-6 (4) of the Connecticut Code of Evidence,[9] and a statement by a coconspirator, codified under § 8-3 (1) (D) of the Connecticut Code of Evidence.

Our standard of review for evidentiary claims is well settled. "To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words,

___

[9] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . (4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . ."

only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

On appeal, the defendant does not claim that the court erred by admitting the statement as a statement against Cruz' penal interest under § 8-6 (4) of the Connecticut Code of Evidence. Section 8-6 (4) of the Connecticut Code of Evidence provides for the admission of a trustworthy statement against penal interest that, "at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. . . ." Our review is limited to those issues raised on appeal. See *State* v. *Saucier*, supra, 283 Conn. 222–23; see also *Thomas* v. *Arafeh*, 174 Conn. 464, 470, 391 A.2d 133 (1978) ("[i]n the traditional appeal, the scope of review is limited by the issues raised and the supportive evidence submitted in the lower court"). On appeal, the defendant has briefed and challenged only the admission of the statement under the statement by a coconspirator exception to the hearsay rule. The defendant has not briefed any claim of error of the admission of the same statement under the statement against penal interest exception to the hearsay rule. Hearsay evidence need only qualify under one exception to be properly admitted. See *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992) ("[a]s a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions").

The defendant, by not briefing any claim of error regarding the statement being admitted as a statement

against penal interest, abandons any claim of error for the court to admit the statement under that exception. See *State* v. *Saucier*, supra, 283 Conn. 223 ("[a]n unmentioned claim is, by definition, inadequately briefed, and one that is 'generally . . . considered abandoned' "). Even if the challenged statement was inadmissible as a statement by a coconspirator, the defendant's failure to challenge the statement under the statement against penal interest exception to the hearsay rule still would leave uncontested that the statement was admitted properly under the unchallenged exception. We, therefore, decline to reach the defendant's challenge to admission under the coconspirator exception to the hearsay rule.

The judgment is affirmed.

In this opinion the other judges concurred.