******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DENNIS SALMOND
## (AC 40237)

Alvord, Elgo and Sullivan, Js.

*Syllabus*

Convicted of the crimes of murder and criminal possession of a pistol or revolver in connection with the shooting death of the victim, the defendant appealed. The defendant's conviction stemmed from an incident in which he allegedly approached the victim's parked vehicle and fatally shot him. The victim's friend, J, was in the vehicle at the time, and he was a witness to the shooting. J identified the defendant as the shooter from photographic arrays that were shown to him by the police, and later identified the defendant as the shooter before the jury during trial. On appeal, the defendant claimed that the trial court violated his constitutional right to due process by denying his motion to suppress J's in-court identification of him, and abused its discretion by denying his request for a special credibility instruction with respect to J's testimony. *Held*:

1. The trial court did not abuse its discretion by allowing J to make an in-court identification of the defendant: the court's determination that, although the out-of-court identification procedure was unnecessarily suggestive, the state had proven the reliability of J's in-court identification by clear and convincing evidence was supported by the record, which demonstrated that J was personally familiar with the defendant, that J had the opportunity to view the defendant in broad daylight on the morning of the murder from the front passenger seat of the motor vehicle and again as J fled from the scene and saw the defendant unmasked, that J's description of the shooter's appearance, which was given prior to his identification of the defendant from a photographic array, was generally consistent with the defendant's appearance as captured by surveillance video, as described by a 911 caller, and as testified to by J at trial, and that the eight day time period between the crime and J's interview in which he identified the defendant was not so long as to render his identification unreliable; furthermore, any alleged evidentiary error as to the in-court identification was harmless and had very little, if any, likelihood of affecting the jury's verdict, as the state had a strong case against the defendant even without J's in-court identification.

2. The defendant's unpreserved claim that the trial court should have granted his request to charge and charged the jury that the out-of-court identification procedure was not substantive evidence of guilt due to its suggestiveness was not reviewable, the defendant having failed to raise before the trial court the particular objection that he asserted on appeal; the record demonstrated that the defendant's request to charge did not specifically state that the out-of-court identification procedure was not substantive evidence of guilt due to its suggestiveness, and although defense counsel objected to the court's proposed jury charge regarding the identification of the defendant, he merely referred the court to the language in the defendant's request to charge, which did not address whether the jury should be permitted to use the out-of-court identification as substantive evidence of the defendant's guilt.

3. The trial court did not abuse its discretion in denying the defendant's request for a special credibility instruction regarding J's testimony: there was no basis in the record for the jury to reasonably conclude that J was involved in the murder of the victim so as to warrant an accomplice instruction, as the jury could have reasonably found that J and the victim were close friends and had known each other for eight or nine years, and that J pleaded with the defendant to stop shooting at the victim; moreover, the defendant's claim that the trial court was required to give a special credibility instruction with respect to J's testimony because he was akin to a jailhouse informant was unavailing, as a special credibility instruction is required in situations where a prison inmate has been promised a benefit by the state in return for his testimony regarding incriminating statements made by a fellow inmate, and the trial court

was not required to give a special credibility instruction under the circumstances here, where J, an incarcerated witness, had testified concerning events surrounding the crime that he had witnessed outside of prison, the court's general credibility instruction having been sufficient under those circumstances.

Argued October 11, 2017—officially released February 13, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the charge of murder was tried to the jury before *Blawie, J.*; thereafter, the court, *Blawie, J.*, denied in part the defendant's motion to suppress; verdict of guilty; subsequently, the charge of criminal possession of a pistol or revolver was tried to the court, *Blawie, J.*; judgment of guilty, and the defendant appealed; thereafter, the court, *Blawie, J.*, issued an articulation of its denial of the defendant's motion to suppress. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Pamela J. Esposito*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Dennis Salmond, appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a) and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2013) § 53a-217c (a) (1). On appeal, the defendant claims that the trial court (1) violated his constitutional right to due process by denying his motion to suppress an eyewitness' in-court identification of him, and (2) abused its discretion by denying his request for a special credibility instruction with respect to the testimony of that eyewitness. We disagree and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. This case is the end result of a dispute over "drug turf" in the east end of Bridgeport. The victim, Kiaunte "Stretch" Ware, lived on Sixth Street in Bridgeport and sold drugs in that neighborhood. The defendant[1] had recently returned to live in the east end and started selling drugs on Sixth Street. The defendant was not a Sixth Street regular, but he "[w]as . . . out there enough" to be noticed by the victim and his friend, Richard Jackson. On July 15, 2013, the victim and the defendant had a physical altercation on Sixth Street. Later that day, the defendant sent a text message to a friend stating that he had been jumped by the victim and another male, who told him that he could not come on Sixth Street. The defendant further stated that he "wasn't hearing [that]" and that he was looking for a gun. On July 16, 2013, the victim pulled a gun on the defendant while the defendant was with his children at a nearby park.

Unlike the victim, Jackson had no issue with the defendant, and the two interacted on four or five occasions in the two weeks prior to the victim's murder. On one occasion, Jackson and the defendant shared a marijuana cigarette and talked for approximately twenty minutes. On another occasion, the two sat together on the porch steps of a property on Sixth Street. Jackson and the defendant also exchanged remarks as they passed by each other on the street. Jackson did not witness the July 15, 2013 altercation, but the next day he was shown a cell phone video recording of the incident.

On the morning of July 17, 2013, at approximately 7:20 a.m., the victim and Jackson were sitting in a car outside the victim's apartment on Sixth Street. The victim sat in the driver's seat with his window rolled down, and Jackson sat next to him in the front passenger seat. The two friends talked about the July 15, 2013 altercation and Jackson cautioned the victim that his dispute with the defendant was unnecessary. The defendant walked up Sixth Street wielding a small black

handgun and approached within three feet of the driver's side of the victim's car. The defendant was wearing a black shirt and his face was covered up to the top of his nose, leaving only his eyes and the top of his head exposed. The defendant fired at the victim and then uttered the words "bitch ass n*****." Jackson told the defendant to "chill" and that he had "proven his point." The defendant, however, fired more bullets, hitting the victim in the left upper neck, left upper shoulder, back and chest. The defendant then fled.

Jackson also fled because there were outstanding warrants for his arrest and he feared becoming involved with the police. As Jackson ran east toward Bunnell Street through the backyards of houses on Sixth Street, he said aloud, "I'm going to jail." He then heard a voice reply, "[m]y bad my n*****," and realized that the defendant, whose face was no longer covered, was running close behind him. The defendant continued running in the direction of Stratford Avenue.

A juvenile standing in the backyard of a house on Bunnell Street, which abutted the backyards of houses on Sixth Street, heard the gunshots and called 911. Shortly thereafter, police and emergency response personnel found the unconscious victim, who was later pronounced dead at Bridgeport Hospital. The police recovered four spent bullets from the victim's car, four spent casings in the roadway and a white tank top in the grass near the victim's car. A firearm never was recovered.

On the basis of video surveillance[2] and witness interviews,[3] Detective Robert Winkler applied for, and was issued, a warrant for the arrest of the defendant on July 25, 2013. That same day, Jackson was arrested on unrelated charges and interviewed by Detectives Winkler and Dennis Martinez about the victim's murder. Initially, Jackson was reluctant to provide the detectives with the assailant's identity. Jackson stated that he had been sitting in the victim's car for approximately four to seven minutes before the assailant ran up to the car and started shooting at the victim. He described the victim's assailant as a black male at least six feet, three inches tall, wearing a black shirt and a scarf or shirt covering most of his face, and wielding a black small caliber gun. Jackson stated that as he was running to his girlfriend's apartment on Bunnell Street, the assailant, whose face was still covered, ran by him and continued in the direction of Stratford Avenue. Later in the interview, Martinez inadvertently used the defendant's street name, "Sleep," instead of the victim's street name, "Stretch." Jackson was shown portions of the Stratford Avenue surveillance video and he confirmed that the man in the video was the person he recognized as the assailant. He claimed, however, that he did not know the assailant's name. Jackson stated that he had seen the assailant on Sixth Street previously and would

recognize him if he saw him again. He also stated that he knew the assailant's voice because he had heard it before and that he could match that voice to a face.

The detectives conducted a blind sequential photo array of eight photographs. When he was shown the seventh photograph, that of the defendant, Jackson became quiet and asked to return to his cell multiple times. The detectives urged Jackson to tell them what he knew and whether the seventh photograph was the assailant. Jackson asked to speak alone with Winkler and attempted to negotiate a release on a promise to appear on his unrelated charges. Winkler stated multiple times that he could try to help but could not promise anything. Jackson admitted that he knew the defendant was the assailant all along, identified him in the seventh photograph in the array and stated that Martinez already had used his street name, "Sleep."

On July 30, 2013, the defendant was arrested and charged with murder and criminal possession of a pistol or revolver. Prior to trial, the defendant moved to suppress Jackson's out-of-court identification and any subsequent in-court identification of the defendant, claiming, inter alia, that the procedures used by the detectives during the out-of-court identification were unnecessarily suggestive, and that, as a result, any in-court identification would be tainted by the improper out-of-court identification. In response, the state contended that it did not seek to offer Jackson's out-of-court identification of the defendant at trial.

A seven day jury trial commenced on September 24, 2014. During trial, outside the presence of the jury, the court conducted a two part evidentiary hearing on the defendant's motion to suppress. After reviewing Jackson's videotaped interview and hearing testimony from Winkler,[4] the court determined that the police identification procedure was unnecessarily suggestive and suppressed the out-of-court identification. The court reasoned that Martinez's inadvertent use of the defendant's street name and "showing [Jackson] the surveillance video that only contained [the defendant was] tantamount to making a suggestion as to who should be picked out of the [photographic] array."

The court then addressed the reliability of any subsequent in-court identification. The court heard testimony from Jackson, who stated that he knew that the defendant was the shooter prior to the interview, but did not want to provide that information to the detectives. Jackson testified that there weren't "too many different people . . . on Sixth Street" and that he "[paid] attention to who was out there." It was important for Jackson, who was involved in the sale of narcotics, to know who the regular people were, "because other people could be snitches." Jackson further testified that he had seen the defendant on Sixth Street four or five times in the two weeks prior to the shooting, and had become

familiar with both the defendant's appearance and voice. Jackson indicated that he would have known that the defendant was the shooter even if he had not seen him a second time as he was running away. The court then asked Jackson the following questions:

"The Court: Sir, you were shown some video by the detectives that was taken from a street pole camera that day. Is that right?

"[Jackson]: Yes.

"The Court: Did that video influence or plant the idea in your mind that [the defendant] was the shooter?

"[Jackson]: No.

"The Court: How sure are you of that?

"[Jackson]: A hundred percent.

"The Court: And did Detective Martinez, using the name Sleep while he was interviewing you, did that influence your identification of the defendant here in court as the shooter of [the victim]?

"[Jackson]: No."

On the basis of Jackson's testimony, the court ruled that "the state [had] established by clear and convincing evidence that under the totality of the circumstances . . . [Jackson's] in-court identification . . . [was] based upon his independent recollection and [was] untainted by any faulty pretrial identification process." The court made the following findings of fact in support of its determination: "[T]his case did not involve a one-time encounter between an eyewitness and a shooter who was a total stranger"; "[t]he defendant and Jackson had been together in each other's company in close proximity in social settings [on Sixth Street] in the days leading up to [the victim's] murder"; "Jackson . . . was already personally familiar with [the defendant] before [the victim] was murdered"; "[Jackson] was also privy to the bad blood that existed between [the defendant] and the victim at the time of the shooting"; "Jackson had a chance to view the [defendant] that morning, both during and after the murder"; "Jackson also interacted and spoke with the defendant immediately after [the defendant] shot [the victim]"; and "Jackson demonstrated an obvious reluctance to cooperate [during his interview] with [the] detectives." (Emphasis omitted.)

Jackson then testified before the jury and identified the defendant as the man who shot the victim. Jackson testified that the main factor in being able to identify the defendant as the shooter was seeing him unmasked as they ran away from the crime scene. On October 6, 2014, the jury found the defendant guilty of murder in violation of § 53a-54a (a) and the court found him guilty of criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2013) § 53a-217c (a) (1). Thereafter, the court sentenced the defendant to a total

effective sentence of fifty years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's principal claim on appeal is that the trial court violated his federal constitutional right to due process by denying his motion to suppress Jackson's in-court identification of him.[5] The defendant's arguments in support of that claim are twofold. First, he argues that, although the court determined that the out-of-court identification procedure was unnecessarily suggestive,[6] the court improperly concluded that the state had proven the reliability of Jackson's in-court identification by clear and convincing evidence. Second, he argues that the court improperly permitted the jury to consider Jackson's out-of-court identification as evidence of guilt. We disagree.

A

We first address the defendant's claim that the court improperly concluded that the state had proven the reliability of Jackson's in-court identification by clear and convincing evidence. Specifically, the defendant argues that Jackson's "brief prior acquaintance" with the defendant and Jackson's "denial that the identification procedure affected him" does not constitute clear and convincing evidence of reliability.[7] In response, the state contends that, although the trial court improperly shifted the burden of proving the reliability of Jackson's in-court identification onto the state, Jackson was sufficiently familiar with the defendant to minimize the risk of misidentification, and that this familiarity, considered under the totality of the circumstances surrounding the crime and subsequent identification, demonstrates that the trial court's ruling was not an abuse of its discretion. Without determining whether the trial court improperly shifted the burden of proof onto the state, we conclude that the court did not abuse its discretion by allowing Jackson to make an in-court identification of the defendant.

We begin by setting forth the applicable standard of review and the legal principles that guide our analysis of a defendant's constitutional challenge to an eyewitness identification procedure. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Internal quotation marks omitted.) *State* v. *Aviles*, 154 Conn.

App. 470, 478–79, 106 A.3d 309 (2014), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015).

"[W]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether [identification evidence] should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Dakers*, 155 Conn. App. 107, 112–13, 112 A.3d 819 (2015); accord *State* v. *Ledbetter*, 275 Conn. 534, 548, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . [our appellate courts] are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the [trial] court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 547; see also *State* v. *Aviles*, supra, 154 Conn. App. 479. "[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 547–48; see also *Manson* v. *Brathwaite*, 432 U.S. 98, 110–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

"[A]n out-of-court eyewitness identification should be excluded on the basis of the procedure used to elicit that identification only if the court is convinced that the procedure was so suggestive and otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Emphasis omitted.) *State* v. *Marquez*, 291 Conn. 122, 142, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). "That the initial identification ha[s] been invalid[ated] . . . place[s] the state under a constitutional restraint to establish an independent basis for the subsequent [in-court identification]. Thus, the burden [is] on the state to establish by clear and convincing evidence that the subsequent [in-court identification is] based on the [witness'] independent recollection." *State* v. *Mitchell*, 204 Conn. 187, 204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); see also *State* v. *Guertin*, 190 Conn. 440, 459, 461 A.2d 963 (1983). "[R]eliability is the linchpin in determining

the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime, the [witness'] degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Mitchell*, 127 Conn. App. 526, 534, 16 A.3d 730, cert. denied, 301 Conn. 929, 23 A.3d 724 (2011); see also *Manson* v. *Brathwaite*, supra, 432 U.S. 114; *Neil* v. *Biggers*, 409 U.S. 188, 199– 200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

With the foregoing factual background and legal framework in mind, we now review the trial court's denial of the defendant's motion to suppress Jackson's in-court identification. We begin our analysis by addressing the court's factual finding that Jackson was "personally familiar" with the defendant. The defendant disagrees with this finding and, instead, contends that he and Jackson were "near strangers." Specifically, the defendant argues that "the state did not cite to any case in which a twenty minute conversation and three to four brief encounters over two weeks creates" sufficient familiarity "to identify him from a brief glimpse . . . or from seven spoken words." In response, the state argues that the court's factual findings were supported by the record.

At the outset, we note that our Supreme Court has declined to "articulate a specific rule regarding the degree of familiarity that an eyewitness must have with a suspect . . . ." *State* v. *Williams*, 317 Conn. 691, 707, 119 A.3d 1194 (2015). "Rather, the typical approach is to consider the nature and extent of the eyewitness' prior knowledge of the suspect, along with all of the other facts and circumstances of the crime and the subsequent identification of a perpetrator, to determine whether a trial court has abused its discretion . . . . [A]ffording flexibility to trial courts is desirable due to the myriad and unpredictable ways in which crimes occur and are witnessed and in which individuals may have had previous contact with each other. . . . [I]n a case in which an eyewitness has a limited, stressful encounter with a criminal actor whose features are largely concealed, a high level of prior familiarity likely would be necessary . . . . On the other hand, if a witness has ample opportunity to view a perpetrator under conditions conducive to an accurate identification and identifies him or her shortly thereafter, a lesser degree of familiarity may suffice." (Citation omitted; footnote omitted.) Id., 707–708.

The record demonstrates that Jackson had a heightened awareness of who was present on Sixth Street,

including the defendant. Jackson had interacted with the defendant at least four times in the two weeks prior to the victim's murder. On the basis of these interactions, Jackson stated that he was able to recognize the defendant by both his appearance and his voice. Jackson also was aware of the ongoing dispute between the defendant and the victim at the time of the shooting. We therefore conclude that the trial court's finding that Jackson was personally familiar with the defendant was supported by the record.

We next address Jackson's opportunity to view the defendant at the time of murder. "This consideration implicates factors that relate to the [witness'] condition at the time as well as the external environment." *State* v. *Artis*, 136 Conn. App. 568, 595, 47 A.3d 419 (2012), rev'd on other grounds, 314 Conn. 131, 101 A.3d 915 (2014). Jackson was an eyewitness to the crime. As the trial court explained, Jackson "had a front row seat to [the victim's] murder." Jackson even referred to himself as the "star witness" because he "[was] the one closest to the person that got killed." Jackson had two opportunities to view the defendant in broad daylight on the morning of the murder; once from the front passenger seat of the vehicle, and again as he fled from the crime scene and saw the unmasked defendant.

Jackson's description of the perpetrator's appearance, which was given prior to the unduly suggestive police identification procedure and his identification of the defendant from a photographic array, was generally consistent with the defendant's appearance as captured by the surveillance video, as described by the 911 caller[8] and as testified to by Jackson at trial. The defendant contends that Jackson's differing descriptions as to what type of pants the assailant was wearing suggests that he altered his original description after viewing the surveillance video. We disagree that this claimed discrepancy is significant, as Jackson himself acknowledged that he was not staring at the assailant's pants and was not sure what he was wearing. We note that Jackson, when testifying before the jury, stated for the first time that the defendant's face was uncovered and visible as they ran away from Sixth Street. Although Jackson's withholding of this fact until trial was proper fodder for the jury to consider when assessing his credibility, it does not significantly impact our analysis of the defendant's claim on appeal. See *State* v. *Williams*, supra, 317 Conn. 713–14 (fact that witness gave more complete description of defendant at trial than during police interview does not compel reversal of trial court's ruling).

Finally, the eight day time period between the crime and Jackson's interview in which he identified the defendant is not so long as to render Jackson's identification unreliable.[9] See, e.g., *State* v. *Sanchez*, 128 Conn. App. 1, 11, 15 A.3d 1182 (2011) (concluding that sixteen

month period between crime and identification did not render witness' identification unreliable), aff'd, 308 Conn. 64, 60 A.3d 271 (2013); *State* v. *Henton*, 50 Conn. App. 521, 535, 720 A.2d 517 (four month period between crime and identification did not render witness' identification unreliable), cert. denied, 247 Conn. 945, 723 A.2d 322 (1998); *State* v. *McClendon*, 45 Conn. App. 658, 666, 697 A.2d 1143 (1997) (two year period between crime and identification did not render identification unreliable where victim had ample opportunity to see defendant, had high degree of attention during encounter and provided detailed description at time of incident), aff'd, 248 Conn. 572, 730 A.2d 1107 (1999). Therefore, after reviewing the record, we conclude that the court's denial of the defendant's motion to suppress Jackson's in-court identification was supported by the record, and not an abuse of its discretion.

Moreover, any alleged evidentiary error as to the in-court identification was harmless. "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *Neder* v. *United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); see also *State* v. *Cook*, 287 Conn. 237, 252, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "[W]hether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Aviles*, supra, 154 Conn. App. 478.

In this case, the jury heard motive evidence in the form of testimony about the dispute and ensuing physical altercations that occurred in the two days prior to the murder. The jury viewed the timestamped video surveillance of the defendant walking toward Sixth Street and then fleeing after the shooting, which the trial court described as "very incriminating." See footnote 2 of this opinion. At trial, the defendant conceded that he was the person on the surveillance footage. The jury also heard a recording of a phone call the defendant made to his girlfriend from his holding cell, in which he asked her if the police had "[found] anything in [her] house." Additionally, the defendant elicited evidence of Jackson's out-of-court identification of the defendant. See part 1 B of this opinion. We therefore conclude, on the basis of the strength of the state's evidence against the defendant, that any alleged error had very

little, if any, likelihood of affecting the jury's verdict.

B

We next turn to the defendant's claim that the court "should have granted [the defendant's] request to charge and charged the jury that the out-of-court identification procedure was not substantive evidence of guilt because of its suggestiveness." The defendant contends that his claim was preserved by his September 29, 2014 request to charge. In response, the state argues that the defendant is not entitled to review of this claim because (1) it was not preserved by the defendant's request to charge, and (2) the defendant has either induced these errors or waived them pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011).[10] We conclude that the defendant's claim was not preserved by his request to charge or exceptions taken at trial and, accordingly, we do not reach its merits.

The following additional facts and procedural history are necessary for the resolution of this claim. During the cross-examination of Winkler, defense counsel introduced portions of Jackson's out-of-court identification "in order to show that Jackson mistakenly identified [the defendant] because of the unnecessarily suggestive procedure." The state objected to its admission. The court sustained the state's objection, but noted that the defendant "[had opened] the door to the state possibly using other portions [of the out-of-court identification] to rehabilitate the identification that [Jackson] made of the defendant because the [out-of-court identification] that the court had previously ordered stricken because it was suggestive has been introduced into this case by the defense. . . . [T]he *state* [*is*] *free to inquire to show that* [*Jackson*] *did in fact make that identification.*" (Emphasis added.) Defense counsel then requested a limiting instruction that the comments of the interviewing detectives should not be taken for their truth; however, defense counsel did not request a limiting instruction as to Jackson's statement. The court then instructed the jury as follows: "The . . . evidence is being offered for the statements of [Jackson]. . . . [Y]ou'll hear certain expressions of opinion by the police officers and those are not being offered for the truth of their opinions . . . but to show their effect on [Jackson] or his responses to those statements." Jackson's videotaped interview was then admitted into evidence as a full exhibit and viewed by the jury.

On September 29, 2014, the defendant submitted a draft request to charge that stated in relevant part: "In this case, the identification of the defendant by the witness, [Jackson], was the result of suggestive identification procedures." On October 3, 2014, the court provided defense counsel and the state with a draft of its proposed jury instructions. That same morning, the court, defense counsel and the prosecutor then reviewed the proposed jury instructions page by page.

The court indicated that it had incorporated language from the Connecticut criminal jury instructions into the section regarding "identification of the defendant." Defense counsel objected, and referred the court to the defendant's September 29, 2014 request to charge the jury with the following language: "In this case, the identification of the defendant by the witness, [Jackson], was the result of suggestive identification procedures." The court denied that request, stating: "The court's problem with the [defendant's] request is the jury may well make that determination. . . . I'm not preventing you from arguing it. I anticipate you arguing it . . . . But I can't make that leap and make a finding of suggestiveness. I found that while there was a taint to the out-of-court identification, I was satisfied based upon [Jackson's] statements and his prior familiarity with the defendant before the homicide, that his in-court identification was not the result of any suggestive out-of-court identification procedure. . . . I'm not going to charge this jury that the identification was suggestive. That may be something that [the jurors] make a [determination] as to which might create reasonable doubt. But I can't tell [the jury] that as a matter of law in this instruction because I believe it is marshaling the evidence in a way that's not appropriate in a charge which is supposed to be . . . right down the middle."

It is well settled that "[a]n appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection." Practice Book § 16-20; accord Practice Book § 42-16. "Thus, a party may preserve for appeal a claim that an instruction, which was proper to give, was nonetheless defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. . . . Moreover, the submission of a request to charge covering the matter at issue preserves a claim that the trial court improperly failed to give an instruction on that matter." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 284, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016). "In each of these instances, the trial court has been put on notice and afforded a timely opportunity to remedy the error. . . . It does not follow, however, that a request to charge addressed to the subject matter generally, but which omits an instruction on a specific component, preserves a claim that the trial court's instruction regarding that component was defective." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Silva*, 113 Conn. App. 488, 495, 966 A.2d 798 (2009). "[T]he sina qua non of preservation is fair notice to the trial court. . . . An appellate court's determination of

whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated [in the trial court] with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Sease*, 147 Conn. App. 805, 814, 83 A.3d 1206, cert. denied, 311 Conn. 932, 87 A.3d 581 (2014).

We have reviewed the record in its entirety and find that at no time did the defendant put the trial court on notice of the alleged error now claimed on appeal. The record demonstrates that the defendant's request to charge did not include the specific language that "the out-of-court identification procedure was not substantive evidence of guilt because of its suggestiveness." Although defense counsel objected to the court's proposed jury charge regarding the "identification of the defendant," he merely referred the court to the language in the defendant's request to charge, which did not address whether the jury should be permitted to use the out-of-court identification as substantive evidence of the defendant's guilt. "To permit [the defendant] to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the [state]. . . . Inasmuch as the defendant raises a claim on appeal different from the one that he raised at trial, he is not entitled to review of his claim." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Saunders*, 114 Conn. App. 493, 504, 969 A.2d 868, cert. denied, 292 Conn. 917, 973 A.2d 1277 (2009). We therefore conclude that the defendant's claim has not been preserved for our review.

## II

The defendant's final claim is that the trial court abused its discretion in denying his request for a special credibility instruction with respect to Jackson's testimony. The defendant contends that a special credibility instruction was required because Jackson was either an accomplice or a jailhouse informant. We disagree.

The following additional facts and procedural history are necessary to our resolution of this claim. On September 29, 2014, the defendant submitted a request to charge, stating in relevant part: "A witness who testified in this case, [Jackson], is currently incarcerated and is awaiting trial for some crimes other than the crime involved in this case. At the time this witness first provided information to the police, he was also incarcerated and awaiting trial for some crimes other than the crime involved in this case. You should look with particular care at the testimony of this witness and scrutinize it very carefully before you accept it. You should consider the credibility of this witness in the light of any motive for testifying falsely and inculpating the accused."

On October 3, 2014, the court denied the defendant's request to provide a special credibility instruction to the jury regarding Jackson, stating: "I . . . think that this is a case that's so completely removed from informant . . . if you believe this witness, he's sitting right next to someone who's shot dead multiple times at very close range. He is as close an eyewitness as I've ever seen in any murder. Whether he's reliable and whether his identification is solid, that's a question for [the jury]. But this man had a front row seat to this whole thing, if you believe him. And so I don't find him to be an informant in that sense. He's an eyewitness with baggage, [which] is perhaps a better characterization of him, and whether that baggage is sufficient to sink his credibility [is] a question for the jury. . . . I'm not going to give the [requested] informant instruction for those reasons."

We turn to the legal principles that guide our review of the defendant's claim. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The primary purpose of the charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 560–61, 747 A.2d 487 (2000). "[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Bialowas*, 178 Conn. App. 179, 187–88, 174 A.3d 853 (2017).

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz*, supra, 252 Conn. 561; accord *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Our Supreme Court has recognized three exceptions to this general rule, including the accomplice exception and the jailhouse informant exception. See *State* v. *Diaz*, 302 Conn. 93, 101–102, 25 A.3d 594 (2011). Neither the accomplice nor the jailhouse informant exception is applicable in this case.

A

The defendant claims that the court was required to provide an accomplice credibility instruction to the jury regarding Jackson's testimony. Specifically, the defendant contends that the jury could have concluded that

Jackson was involved in the shooting due to his presence and subsequent flight from the crime scene; and because he displayed concern over being suspected as the culprit.

"[When] it is warranted by the evidence, it is the court's duty to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [he] assisted or aided or abetted in the commission, of the offense with which the defendant is charged. . . . [I]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose." (Internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 597–98, 134 A.3d 560 (2016); see also *State* v. *Gentile*, 75 Conn. App. 839, 855, 818 A.2d 88 ("[t]he court's duty to so charge is implicated only where the trial court has before it sufficient evidence to make a determination that there is evidence that the witness was in fact an accomplice" [internal quotation marks omitted]), cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003).

In the present case, there was no basis in the record for the jury to reasonably conclude that Jackson was involved in the murder of the victim. The jury could have reasonably found the following additional facts. Jackson and the victim had known each other for eight or nine years. Jackson was very close friends with the victim and described him as a "big brother." On the morning of the murder, they talked about "getting out of the hood" and had planned on driving to New Haven to fill out applications at Gateway Community College. Jackson pleaded with the defendant to stop shooting at the victim. The evidence adduced at trial simply did not warrant an accomplice instruction. We therefore conclude that the court did not abuse its discretion in denying the defendant's request for an accomplice instruction.

B

The defendant also claims that the court was required to provide a special credibility instruction to the jury regarding Jackson's testimony because he was "akin to a jailhouse informant." The defendant contends that this exception is applicable because Jackson attempted to negotiate the detectives' assistance prior to identifying the defendant.

Our Supreme Court adopted the jailhouse informant exception in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), holding that a special credibility instruction is required in situations where a prison inmate "has been promised a benefit by the state in return for his or her testimony" regarding incriminating statements made by a fellow inmate. Id., 469; see also *State* v. *Diaz*, supra, 302 Conn. 102 ("a jailhouse informant is a prison inmate who has testified about confessions or inculpatory statements made to him by a fellow inmate"). In

*Diaz*, our Supreme Court declined to interpret its decision in *Patterson* as "[requiring] a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that [he] witnessed outside of prison"; *State* v. *Diaz*, supra, 102; reasoning that such an exception "would swallow the rule that the trial court generally is not required to give such an instruction for the state's witnesses." Id., 110. Instead, when the "jury [is] aware of the [nonjailhouse informant] witness' involvement in the criminal justice system and their expectations that they would receive consideration in exchange for their testimony," a general credibility instruction is sufficient. Id., 103.

Jackson testified at trial regarding events that he personally witnessed from his "front row seat." Therefore, the defendant's claim is controlled by *Diaz* and fails accordingly. See *State* v. *Jackson*, 159 Conn. App. 670, 673–75, 123 A.3d 1244 (2015) (jailhouse informant instruction inapplicable where "incarcerated witness receive[d] a benefit from the state in exchange for testimony regarding a crime [he claimed to have] personally observed prior to his incarceration"), cert. granted on other grounds, 325 Conn. 917, 163 A.3d 617 (2017); *State* v. *Carattini*, 142 Conn. App. 516, 523–24, 73 A.3d 733 (jailhouse informant instruction inapplicable where witness testified regarding "observations and recollections of the events surrounding the murder"), cert. denied, 309 Conn. 912, 69 A.3d 308 (2013). Moreover, the court, in its charge to the jury, gave a general credibility instruction regarding the testimony of witnesses. In that instruction, the jury was told to consider if "the witness [had] an interest in the outcome of the case, or any bias or prejudice concerning any party or any matter involved in this case" and to "evaluate the testimony of all witnesses by [the jury's] own knowledge of human nature and of the motives that influence and control human actions." See *State* v. *Ebron*, 292 Conn. 656, 675, 975 A.2d 17 (2009), overruled on other grounds by *State* v. *Kitchens*, supra, 299 Conn. 472–73; *State* v. *Carattini*, supra, 525–27. We therefore conclude that the court did not abuse its discretion in denying the defendant's request for a jailhouse informant instruction.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant is also known by his street name, "Sleep" or "Sleepy."

[2] On the day of the murder, Detective Robert Winkler reviewed surveillance footage from cameras posted by the Bridgeport Police Department at three intersections along Stratford Avenue. The defendant emerged from an apartment at the intersection of Stratford and Hollister Avenues at approximately 7 a.m. The defendant walked west on Stratford Avenue, in the direction of Sixth Street, while using his cell phone. The defendant had something white draped over his shoulder and his dominant right hand was positioned in a way that suggested he was carrying a concealed weapon. At 7:22 a.m., minutes prior to the shooting, the camera posted at the intersection of Stratford and Newfield Avenues captured the defendant at the corner of Stratford and Bunnell walking in the direction of Sixth Street. The shooting was not captured on video as there was no camera focused on that area of Sixth Street. At 7:27 a.m., the defendant emerged from the empty lot on the

corner of Bunnell and Stratford without the white item. The defendant continued eastbound on Stratford Avenue, at times running, repeatedly looking back in the direction of Sixth Street.

3 In the defendant's arrest warrant, Detective Robert Winkler stated that an anonymous witness was shown the surveillance video and "immediately . . . identified 'Sleepy' as the individual."

4 Winkler testified that prior to the interview, he knew that Jackson was the victim's friend and was sitting in the passenger seat of the victim's car at the time of the homicide. He further testified that he "was quite confident that [Jackson] was familiar with the [defendant], just reluctant to give [him] specific details."

5 The defendant also asks this court to consider whether his state constitutional rights provide him greater protection. We decline to review the defendant's state constitutional claim because it is inadequately briefed. The defendant allots two paragraphs of his brief to this claim, which provides no substantive analysis in support of his claim. This court is "not required to review issues that have been improperly presented . . . through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). Because the defendant's state constitutional claim is inadequately briefed, we decline to address it.

6 On appeal, the state has not challenged the trial court's finding with respect to the suggestiveness of the out-of-court identification.

7 The defendant also asks this court to extend our Supreme Court's holding in *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), to disallow in-court identifications in situations "when the out-of-court identification procedure is unnecessarily suggestive and either suppressed or the prosecution declines to offer it as evidence, and there is a factual dispute about the witness' ability to identify the defendant." The state contends that "*Dickson* itself . . . rejects such an extension." We agree with the state. In effect, the defendant asks us to overrule Supreme Court precedent. However, "[i]t is not within our function as an intermediate appellate court to overrule Supreme Court authority." (Internal quotation marks omitted.) *State* v. *Holmes*, 59 Conn. App. 484, 487–88, 757 A.2d 639 (2000), aff'd, 257 Conn. 248, 777 A.2d 627 (2001), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002). In *Dickson*, our Supreme Court narrowly held that "in cases in which identity is an issue, in-court identifications that are not preceded by a successful identification in a nonsuggestive identification procedure implicate due process principles and, therefore, must be prescreened by the trial court." (Footnote omitted.) *State* v. *Dickson*, supra, 415. The *Dickson* court recognized that "[*a*] *different standard applies* when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification." (Emphasis added.) Id., 420; see also id., 447 n.31. That "different standard" is applicable here and, therefore, is the standard that we will apply in analyzing the defendant's claim.

8 The caller described the gunman as being "very tall," wearing all black and having a black and white bandana covering his face.

9 Additionally, although Jackson did not come forward with information voluntarily, the court properly viewed these facts under the totality of the circumstances, given the unwillingness of neighborhood residents to provide information or testimony for fear of being labeled as a "snitch." The court itself noted that "[it understood] how difficult it is to get people to testify in inner city homicides." Jackson testified that being known on the street as a snitch was not a good reputation to have. The court also heard testimony from the 911 caller that his aunt told him to "shut up" in Spanish while he was speaking to the 911 operator, and that she was not supportive of his speaking to police. Bridgeport Police Officer Ilidio Pereira, the initial officer to arrive on scene, testified that he was not "successful in locating anyone who [wanted to provide] information about a suspect" and that "it didn't look like anyone wanted to talk to [him] because they quickly walked away." This was not uncommon in Pereira's experience as an officer, because people "don't want to be known as a . . . [snitch], someone that's cooperating

with law enforcement to . . . apprehend the suspect of a crime.”

[10] The defendant has not requested review as to this claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Accordingly, we need not determine if these claims have been waived pursuant to *State* v. *Kitchens*, supra, 299 Conn. 447. See *State* v. *Hall-Davis*, 177 Conn. App. 211, 240, 172 A.3d 222 (2017) (“[i]t is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *Golding* unless they have been induced or implicitly waived” [internal quotation marks omitted]).

―――――――――――――――――――――